I want to start by, I guess, framing the parties' relationships. And it's a pretty typical structure that we see and plays itself out every day probably a thousand times within the 8th Circuit. Steck is a grain producer. Steck owns the corn that was at issue in this case. Steck granted a security interest to Farm Credit. And that security interest was granted pursuant to a security agreement that's a part of the appendix. And it begins with a sentence that references that it is a granting, it is a giving of rights by the farmer to Farm Credit. That security agreement also states that Mr. Steck was authorized to sell the crops. It also states that Mr. Steck, in the event of a default, that Farm Credit had the right to take possession of the collateral. And that's found on the backside, paragraph 9 of the security agreement. That in the event of a default, Farm Credit has the right to take possession of the collateral. In the event that that collateral has been sold to a third party, the security agreement states that Farm Credit has the right to go to that third party and receive the accounts and receive the payment directly from the third party. That's what this security agreement provides. Farm Credit's rights are derivative of those of Mr. Steck. Now, Farm Credit perfected the lien by filing an effective financing statement. The effective financing statement is filed pursuant to the Food Security Act and it provides that Farm Credit has a lien with respect to certain collateral and also with respect to certain accounts. You're conceding that the EFS was done properly, right? Right. So we're in the account debtor 9404 realm and its relationship to the FCS? Well, Your Honor, I was making a point that the effective financing statement, by law, is required to state the means by which a buyer can satisfy the effective financing statement. The effective financing statement that was filed here speaks to the payment of proceeds and speaks to being an effective financing statement as to the collateral. The way that this plays out in ordinary course in the Cargill contract… I didn't see a noncompliance argument in the brief. Are you making one this morning? No, Your Honor. We're not making an argument that Farm Credit didn't comply with the Food Security Act. I'm pointing out that the effective financing statements specify the means by which you satisfy the effective financing statement, proceeds or through the collateral. The way this plays out in practice is that when grain gets delivered to the grain dealer such as Cargill, Cargill issues a two-party check. That's what happens every day. There's a two-party check that goes out, and the bank has to sign off on the check, and that satisfies the effective financing statement. There's no further dialogue that occurs between the grain dealer and the lender. They just issue a two-party check. The situation that occurred in this case, of course, is that there was no two-party check issued. The reason there was no two-party check issued is because there was no money that was owed by Cargill to stack. Now, Cargill's contract… This is due to offset, right, counsel? Well, we use the term offset or set-off in the contract. I think it would more technically be described as recoupment. Well, regardless, would you address the 9-320F flat statement, no buyer can take advantage of offset to defeat a priority? Because, boy, that seems just to cover this case so easily. Those few 10 or 15 words, you know, that seems easy. Actually, your honor, I think, as the court knows, 9-320F is a unique provision to Nebraska law that is not a part of the regular Uniform Commercial Code. It governs this case, though, counsel. Right. Okay, proceed. It refers to offset, and offset, if you look at the legislative history that we've referred to, because this wasn't discussed at all at the district court, if you look at the legislative history, it talks about the common law right of offset. That would be applicable if we had this situation. Now, what legislative history are you talking about, counsel? The legislative history when 320F was passed. Describe it to me briefly. There was an exchange about this bill that was put forward. It was put forward by the Nebraska Bankers Association, and the concern had to do with co-ops, essentially. So you have a co-op that's, let's say, you're selling seed, you're selling chemicals, you're selling agronomy services. And then in the fall, the farmer hasn't paid for those things, and you get grain delivered, and the co-op comes in and says, we're going to exercise the common law right of offset. We're not going to pay you for the grain because you owe me on the chemicals. Sounds like this case so far. No. Why not? The reason it's not this case is because the grain contracts at issue were defaulted. This is a situation that… We have a default in this case, too. We have a default on the grain contract itself. It's a recoupment situation. Cargill has a defense to payment. Cargill's not saying, Mr. Steck owes me money over here for seed, fertilizer, chemicals. Cargill is saying, we don't owe him on this specific contract that he's trying to seek on. 320F would be absolutely applicable if Mr. Steck had purchased these other things or had ancillary contractual relationships with Cargill that Cargill was trying to offset. It's not applicable in a situation here where we have recoupment. We have a defense to payment on the specific contract that's involved between the parties. The fact of the matter is that Mr. Steck could not bring an action against Cargill to recover. Mr. Steck still owes Cargill over a quarter of a million dollars. These forward contracts were entered into at a time when the market was $3.50 to $4.50. We had a material upward market movement. Your whole argument turns on one interconnected series of relations, right? Well… I mean, there were sequential deliveries. There were sequential deliveries. Cargill owed him for the grain delivered. It doesn't matter whether there was a master contract or not. No, Cargill did not owe him for the grain delivered. What were the payment terms? The payment terms would provide for payment, but in this situation, Mr. Steck didn't deliver the balance of the corn. Yeah, but when? He owed the money before the balance was out of the field. No, he did not. There was no request for payment for his part. There was no 30-day payment term. He breached the contracts. He stopped delivering corn. He breached the contract. Cargill had no obligation to issue payment to him. How quickly were you supposed to pay him for that first amount, the part that Cargill got? How quickly were you supposed to pay him under the contract? Nebraska law does not specify… No, I'm talking about the contract. You had a contract with him. What's the contract say about payment? I don't believe the contract has a payment term. You're kidding me. No. It seems like, ah, that a contract wouldn't have a payment term. In many states, this is dictated by state law and prompt payment obligations that tie back to the bonding that's associated with grain dealers. Nebraska does not have that specification. So here, you have a situation where the payment… Well, does state law impute a reasonable time to pay for that, counsel? Does the state law? I don't know that state law would impose a reasonable time or not. Oh, counsel, let me pursue that with you. Sure. In Missouri, I'm sure it would impose a reasonable time and good faith and fair dealing clause, and I could give you 20 of them, but you've got my point. How much time… Are you sure? How much time Missouri would impose would depend upon how many major grain dealers Missouri had failed. And they've had a lot, so proceed. So they'd probably impose a short time period by law. Iowa's had a few… Well, no, answer Nebraska. I'm sorry. I took you afield and you pursued it. Nebraska law does not specify any time period, Your Honor. Not even a reasonable time period on paying on a contract. Well, I believe that reasonableness is implied… I think you know too much about grain and not enough about contracts. I think that reasonableness is applied under Article II, Your Honor, but I don't know what in terms of the time period that would be. Well, Article II would apply, wouldn't it? Yes, Article II would apply. I don't know that it necessarily matters to the analysis what the time period would be on Cargill making this payment to Mr. Steck. The fact of the matter is… Well, how long do they have the right to set their offset or recruitment? How long do they have to do that? How long do they have… End of the contract? Surely the end of the contract, right? Well, surely in this situation, Mr. Steck defaulted while he was delivering and stopped performing. So as soon as he stopped performing, as soon as he started… That's the moment you could do it. Well, right. As soon as he stops delivering grain and Cargill is concerned, why are you stopping delivering grain? You still owe us another X hundred thousand bushels. Then Cargill said, we're not going to pay you. That's January 21st. Until you bring us the grain. Right. Sometime in January. When the Chapter 12 was filed. Sometime in January, yes. And I think the record is clear that… The initial corn was delivered in 2010. He started delivering corn, I think, in December 2010 and it was just coming truck after truck after truck. So I think, you know, from Cargill's perspective, Cargill didn't see anything that was awry here. If Mr. Steck had come in and asked for payment, he probably would have been issued payment. The fact of the matter is he stopped delivering, which gives rise to concern. Ralph, I understand that. My problem is with 9404. Sure. A1 does not make… A1 is worded as though it applies to assinees subsequent to the account debtor's relationship. And then you cite a bunch of cases on pages 24 and 25 that I haven't read. Which of those cases allow 9404A to trump a prior perfected security interest? Well, Your Honor, I think they're two separate analyses. There's the perfected security interest. The take subject to. Why does Fire and Credit Services take subject to an account debtor relationship that doesn't exist when its security interest is perfected? That's what I'm having trouble understanding. I think if I could explain the split. The Nebraska Bankers Association submitted an amicus brief in this case. In the amicus brief, they refer the court to this case of Handy v. Harmon. And the Handy v. Harmon court dealt with this issue of 9404. And it spoke about how if you have a 9404 situation where the bank is going after the proceeds from the sale, then the bank is subject to any defense that the account debtor has. So in this situation, if you're going after proceeds, it's clear under 9404 that you have, we have the right, Cargill has the right to assert any defenses. What Farm Credit does then is pivot. Farm Credit pivots, and they say we filed this as a replevant action. If you look at the Handy v. Harmon case, this is where the language of the court talks about how 9318, which is the former 404. They say if you have that situation and you're going after the proceeds, you have to worry about defenses to payment. But they say the bank doesn't have to worry about that if it has a right for conversion. There's another case that's actually a Farm Credit case, Maine Farmers Exchange v. Farm Credit of Maine, which is 2002, Maine 18. And it's a case that recites back to Harmon. And the majority in that case, Maine Supreme Court case involving Farm Credit, agreed with Cargill's position and said that under 9404, if you have a defense to payment, you don't have to pay. And this situation involved the sale of potatoes. There's a dissent, however, in the Maine case. No, it's a concurrence, right, counsel? Well, it's a concurrence, but. Counsel, it's a concurrence. Proceed. Well. Don't fib to us. It's a concurrence. Proceed. I have it in front of me. All right. It says that the second issue that has to be considered is this conversion claim. And in this case, the court, you know, ultimately sided with the majority and said that the buyer won the case. Do you think the concurrence is accurate, counsel? What's that? Do you think the concurrence accurately states the law? Do I think that the concurring opinion in the Maine case accurately states the law? Softly in Dana, I think. My belief on this, Your Honor, is that Article 9 and 404 apply here and apply to prevent farm credit from having rights that rise above Cargill. The issue in the concurrence is, well, even if you win under 404, you have this freestanding cause of action for conversion. And the issue that I have with that is my belief is, and I think this is the thrust of our briefing, is that Cargill has no legal relationship with farm credit. It has no contract with farm credit. Cargill's only relationship with STEC. Farm credit's only relationship was with STEC. That farm credit can't assert rights that are greater than STEC's rights. As to this issue, whether or not the conversion claim, whether you have a freestanding claim of conversion, I think that the majority decision here was correct in ruling you didn't need to get to that. But to the event that you do, the event that you do, the district court didn't do that here. If you look at the district court's ruling, the district court refers to Section 9315 and talks about security interests, surviving disposition, the collateral. And then says that in certain circumstances, you can have a conversion action flowing from that. But then the ruling, the actual ruling that the court issues doesn't reach that issue. And that's part, we feel that the ruling is just incomplete. The court's analysis was essentially, well, farm credit has a security interest that was granted by STEC. Therefore, it has some possessory right. It has some right to the property at some point in time. And we don't feel, Your Honor, we feel that 404 is appropriate and we have the right to defenses. But beyond that, Your Honor, we don't think farm credit can make out cause of action for conversion here based on the facts that are presented. So you're saying that even if farm credit didn't take subject to Cargill's interest, it can't exercise its secured party's right against the proceeds? I say that- That's what I'm hearing in the argument. It's not about, farm credit isn't taking something subject to- But you're relying on 9404A. That's what it's talking about. Who takes subject to what? 9404A deals with defenses to payment. And in this case, Cargill has a defense to payment. It's not about perfection or being unperfected. Cargill doesn't have a perfected security interest. It talks about, the assignee is farm credit, right? Yes, the assignee is farm credit. It took an assignment from STEC. The rights of an assignee are subject to the account debtor's rights. Right, but there's no discussion there about the temporal relationship. I don't think there's a requirement that the- It's certainly implicit. I respectfully disagree, Your Honor. If we have a situation where farm credit is signing a security agreement and we have a year, two years, three years to go by, these account debtor relationships are going to come up as the debtor sells the property. But your brief says that 9404 is our linchpin. That's correct, Your Honor. Now you're just telling me, disregard 9404 because it doesn't really address what we're arguing. I am totally confused. I apologize, Your Honor. Well, no. I mean, I think you're, you know, it's sort of any port in a storm being argued here. Well, I apologize, Your Honor. I see my time is up. I don't understand your position. Your Honor, our position is that farm credit's rights rise no higher than those of STEC. And Cargill doesn't owe STEC any money. And therefore, Cargill doesn't owe farm credit any money. We believe that that's codified in section 9404 and that Cargill has a defense to payment. But fundamentally- But if Cargill had the prior title, that's what the conversion case is focused on, right? If it had the superior title. There was no discussion of whether or not Cargill converted in the district court's ruling. The district court's analysis was that farm credit was superior under the Food Security Act and therefore it wins. Thank you, Your Honor. Thank you. Mr. Patterson. It pleases the court. My name is David Peterson. I hesitate to correct the quarter out of the bat. It's been dispelled for years. I'm an attorney for Farm Credit Services. Happily in this case. If I might, I might address one thing that came up as far as why the checks were not written. And in the Farm Credit Appendix to Brief on page-it shows us page 36. It's part of the testimony of-it's actually page 6 of the appendix. The question of the Cargill representative was question on line 6 and why had no check been written. Answers on line 7 and 8. The customer did not request the check. That is my understanding from the record as to why the check had not been written. For the brain that's at issue here. The customer simply hasn't asked for it yet. All the relevant facts- Does it reflect any place what the normal course was on payment? If it does, I'm not- Okay, proceed. All the relevant facts are agreed to. We think there are two undisputed facts that are most significant. First is the chronology of events here. And second is the fact that this is a replevant action. As far as the chronology of events are concerned, the court has already raised some questions about priority. Our position is Farm Credit took a lean on crops. Farm Credit perfected this lean. Third, Farm Credit went the extra step to follow the procedure under the Nebraska Central Farm Requirements Food Security Act. After those were completed, the debtor, Mr. Steck, entered into contracts with Cargill. And the defaults that occurred under their contracts and the default that occurred between Steck and Farm Credit all happened after these other events had taken place. There's no question that Farm Credit's lean has priority in terms of time. We don't believe there's any question that those Cargill contracts were taken subject to the existing Farm Credit lean. Do they say so? In plain English, do the contracts say that? Do the Cargill contracts? Yeah, the contracts between Steck and Cargill. They don't play it in plain English. There's no reference. Yeah, proceed. The other fact that's significant is this is replevant. Farm Credit had several avenues to pursue when there was a default. One of those would have been under some contract theory. But there was no contract between Farm Credit and Cargill. The only contract was between Farm Credit and the debtor who was now in bankruptcy. There were numerous contracts between Cargill and the debtor. But, frankly, there just wasn't any contract action. Another was tort, conversion, wrongful withholding. This, frankly, at the time I was thinking about it didn't feel like a wrongful type deal. It was a business transaction. They were withholding. But there were two other opportunities. Two were under statute. One is a suit on an account under UCC section 9607. The other is a suit to recover the collateral by judicial process, replevant. That's under UCC 9609. That is what we chose. Counsel, now, the main case is the best exposition, I think, of all this. And in the concurring case and the main case, they equate repossession and conversion, I think. They say there are two routes. The first is sounds and contract. The second is independent, involves the goods themselves. They quote Handy and Harbin, the Ninth Circuit case, and say repossession or conversion. Do you think those are legally on the same level, conversion and replevant? I actually believe that they're basically the same theory, Your Honor. The main court did, too. Go ahead. And we ended up filing replevant. We didn't have an account. We didn't sue. We had a right to sue on accounts. We did not sue an account receivable. We didn't sue for an account balance. We said we want our property back. And that's the nature of the replevant action. Now, Cargill, in addressing Judge Benton's question, says that 9320F doesn't apply because, well, that statute says no buyer may use offset to defeat a priority established by a lien of security interest. Cargill's reasoning is, well, that refers to a buyer, not an account debtor, and we're an account debtor. And you see that throughout their argument in their brief. The problem is this is not a suit on an account. They would like to be an account debtor because I think it gives them a stronger argument than 9404, but the fact is they are a third party holding farm credits collateral. Counsel, the first time this argument was raised was in your brief in this court, right? The reference to that statute was, yes. I think the argument has been raised, but not specifically with regard to 9320F. Has that law been around since 2007? I can't tell by the amendments. It's been around a little longer than that. Well, which amendment is it to the Uniform Commercial Code in Nebraska? I see the amendments listed there, and I just don't know which one it is. I don't have that on me. Okay. We'll find out. Go ahead. Another phrase that is significant here is the phrase subject to. That language appears several places in the Food Security Act. It says that a buyer of farm products takes subject to the security interest of the lender. That really can't be any more plain than it is. Cargill does not want to be a buyer. They want to be an account debtor in this case, and the reason, again, is that 9404 argument. But it simply is not the case. And if we look at the chronology of events, farm credit could not have taken anything subject to Cargill's contracts because the contracts, by all the evidence and by the dates, were not in existence. Farm credit could not take a lien subject to Cargill's contracts just by point in time. There's an attempt to create kind of a complicated interplay between the UCC and the Nebraska FS Food Security Act. There are some lengthy explanations there, but frankly, those things go hand in hand. And had farm credit failed to comply with the UCC, we'd have a problem. If they had failed to comply with the Food Security Act, we might have a problem. But the fact is they did both. There's no inconsistency there. And as Judge Coff and some others have raised the point, the Food Security Act was enacted to clarify some of this, not inject uncertainty. And that, I think, is what basically the argument by Cargill does is try to make this uncertain. And it may be an overstatement, but frankly, if Cargill prevails in this case, I'm not sure how that Food Security Act works down the road representing lenders. It would be very difficult to know when you really have secured yourself. We don't think there's any genuine issues to any material fact. The only way Cargill could prevail is to inject some uncertainty. We think that Judge Battaglia had this absolutely right, and we would request that the court affirm the lower court opinion. Well, Counselor, you said there's no way to protect you if we rule for the other side. You could put it in the contract, right? You could make the growers put it in the contracts with the Cargills. You might even beat on the Cargills to put it in the contract, but I don't understand the market that well. Well, frankly, that is a problem because this is a separate contract between the borrower and Cargill. It would require, say, a lender like Farm Credit to monitor where all those contracts are going, and it's the reverse, I think, of what the Food Security Act was intended to do and say, let's get away from all of that selling across state lines, selling different. Let's put it in one place where somebody can check, the buyer can check. So the burden is on the lender to comply with these statutes. Once they've done that, then it switches around, and the buyer of farm products needs to check and see who they're supposed to put on the check. Now, we do have a bit of a unique situation here factually, but the fact is that the Farm Credit complied with everything, and if they don't get the money on this, I don't know how they're going to secure themselves down the road. I recognize it puts a burden on the buyer also. But I think we've done what we can do as a lender. Cargill makes point of all the money you got from Pride in the course of making sure the bankrupt breached its contract commitments. I suppose you say that's all irrelevant? We do, Your Honor. I mean, I can tell you that nobody made out on this deal. Mr. Steck left several creditors, so the fact that we're going to recover some other areas doesn't have anything to do with the relationship of this grain that we're trying to recover. Well, you, with the bankruptcy court's permission, were able to seize the grain that was on hand when the Chapter 12 was commenced. That's correct. And Cargill says, if you'd just delivered it to us for our contract price, there'd have been no breach to offset. Well, that gets into some... No claim to offset. I mean, there's quite a bit, there's a fair amount of equity in that position. I understand that, but that presupposes that Cargill did whatever they could do to protect themselves. I mean, once the bankruptcy was filed, certain actions were taken that are not contained in the record that make this a more complicated situation. I thought they got no notice of your... Well, I think they did not receive a bankruptcy notice, Your Honor. I think they were aware of the bankruptcy. The testimony shows that. But in terms of equity, no one made out real well on this. Thank you. Why is that? Why am I not surprised in a bankruptcy case? That's right. Thank you. Mr. Bilem has some time. He has no time left. I'll give you a minute if there's anything you want to respond to. I think it's been well briefed and argued. Sure, Your Honor. Just very briefly. With respect to the points of sale of the Pride Ag, yes, Farm Credit, by pursuing this course, was able to recover more money than they would have recovered in delivery. Again, I don't believe, to the main case, I do not believe that Farm Credit could make out a claim for conversion here. Because Farm Credit, at the time of delivery, they didn't have the right to take the collateral. They didn't get the ability to take the collateral until March 15th, two months after the delivery to Cargill. They didn't ask Cargill for the corn back until April 25th. By that time, the corn's gone. And because of their other actions... But under Nebraska law, you can still pursue the money, right? What's that? Under Nebraska law, you can still pursue the money, even if the item's gone. That's not true in other states, by the way. Right. And for a conversion action in Nebraska, you can still pursue the money. No, but how about Replevin? In Replevin, you can, too. They cite these cases. Your Honor, my understanding of conversion and Replevin is that they're the same. So I... Okay, proceed. My understanding is they're the same. And again, I can't see how Farm Credit, under the facts presented, can make out that conversion-slash-Replevin claim against us. And the district court didn't reach that issue. And I think that that was an error. Thank you, Your Honor. Thank you, counsel. Well briefed and argued. Complex case. We will take it under advisement.